**IN THE COURT OF APPEALS OF IOWA**

No. 24-1222
Filed October 2, 2024

**IN THE INTEREST OF N.W.,**
**Minor Child,**

**R.W., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Dallas County, Erica Crisp, Judge.


        A father appeals the termination of his parental rights and advocates for establishing a guardianship with the child's aunt as an alternative.  **AFFIRMED.**


        Nicholas Einwalter, Des Moines, for appellant father.

        Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

        Jeremy Evans of Carr Law Firm, P.L.C., Des Moines, attorney and guardian ad litem for minor child.


        Considered by Tabor, C.J., and Ahlers and Sandy, JJ.

**TABOR, Chief Judge.**

A father, Ronald, appeals the termination of his parental rights to his now three-year-old daughter, N.W. He argues that terminating his rights was not in the child's best interests. He contends that a guardianship with the child's aunt—instead of termination—would be "ideal for all." After our independent review of the record, we reject the father's contention.[1] As N.W.'s guardian ad litem (GAL) observed, this is not an appropriate case to disregard the preference for termination over guardianship when seeking permanency for a young child. Thus, we affirm the juvenile court order.

## I.      Facts and Prior Proceedings

In July 2022, Ronald broke into the home of his ex-girlfriend and, "in a fit of rage," strangled and kicked her in the presence of their one-year-old daughter. After the assault, the mother checked into a hospital for mental-health treatment. Because N.W. had no caretaker, the Iowa Department of Health and Human Services intervened, and the juvenile court approved the child's removal from parental custody. The court adjudicated N.W. as a child in need of assistance (CINA) in September 2022. Meanwhile, the department placed N.W. in a family foster home. The department returned N.W. to her mother's custody in August 2023 but removed her a second time one month later. The mother was experiencing instability and contacted the foster parents to care for N.W.

---

[1] We review termination proceedings de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). Our paramount concern is the child's best interests. *Id.* The State bears the burden "to show by clear and convincing evidence that the requirements for termination have been satisfied." *Id.*

Meanwhile, Ronald failed to engage in services during the first year of the CINA case. His first supervised visit with N.W. did not happen until October 2023, some fifteen months after the first removal. Around the same time, he completed a substance-use evaluation that recommended treatment. But his therapy attendance was sporadic, and the department did not receive progress reports. Similarly, Ronald did not address his perpetration of domestic violence and continued to commit other criminal offenses until May 2023. Those offenses included criminal mischief and a contempt violation of a no-contact order. On top of those concerns, he did not have a job or stable housing.

In March 2024, the State petitioned for termination of parental rights. The mother did not attend the June hearing, and through counsel, consented to the termination of her parental rights.[2] Ronald attended the hearing but did not testify. In fact, no testimony was presented. Instead, the court accepted exhibits offered by the State without objection from parents' counsel. And no further evidentiary record was made.[3]

In closing arguments, the State acknowledged that Ronald had made "some progress" but insisted "in no way is he ready to take primary custody and control

---

[2] Thus, she is not a party to this appeal.

[3] "We have discouraged and continue to discourage the practice of conducting juvenile hearings based on written reports rather than testimony, as it makes review more challenging, and it presumably makes it more difficult for the juvenile court to make necessary factual findings." *In re A.S.*, No. 22-1851, 2023 WL 1812838, at *1, n.2 (Iowa Ct. App. Feb. 8, 2023) (citing *In re H.V.*, No. 20-0934, 2020 WL 6157826, at *4–6 (Iowa Ct. App. Oct. 21, 2020) (reversing termination based on State's failure to prove its case through exhibits without adequate foundation)). Because the parties here agreed to the admissibility of the exhibits, we have a different outcome than in *H.V.*, but we continue to discourage the practice of trying the case exclusively on exhibits. *Id.*

of this child." In addressing who would assume custody of N.W., the State offered

this analysis:

> [B]y law the first person the department has to consider is any family members that have come forward requesting [N.W.] be put into their care, and we know that Ronald's sister has come forward. It's my understanding that she lives in Illinois. An ICPC [Interstate Compact on the Placement of Children] study was done and was approved some time ago. Unfortunately, due to the longevity of this case, that has expired, and the department is now seeking a second ICPC. Hopefully it will also be approved so that we can attempt to get [N.W.] moved to Ronald's sister's home in Illinois.
>
> I know there have been numerous FaceTime visits between Ronald's sister and [N.W.], and those appear to be going well. Certainly it's my position that the sister should make every single attempt to get to Iowa to meet this child and spend time in person with this child and determine whether or not that is really going to be a long-lasting working dynamic between them before we try placing her in Illinois, but again, that is a legal requirement that she is first in line for placement of [N.W.] at this point.

The GAL commended Ronald for being "in a better place than where we

were when the case started." But he echoed that Ronald was "just not in the right

place" to assume custody of N.W. The GAL noted that "the real issue is the

guardianship versus the termination." And the GAL did not favor a guardianship:

> [N.W. is] very young, so obviously the courts do not like to do permanency on a very young child, especially in this case where the child over the vast majority of the child's life has been DHS involved and not in the father's care. That role has never been assumed by the father as the sole care provider.

The GAL also expressed reservations about the aunt being out of state and

needing to complete another ICPC. In his view,

> [T]he fact that the aunt has been unable to visit [N.W.] has kind of demonstrated a little bit of a lack of commitment to me.
>
> There's not a whole lot of effort to come see the child that you're asking us to send to you and trust you to raise and care for for more many years.

As his bottom line, the GAL favored terminating Ronald's parental rights so that N.W. could be adopted, either by her aunt or another suitable party.

Ronald did not contest the grounds for termination. His attorney told the court: "[M]y client recognizes as we sit here today that he is not in a position to be able to ask the court with a straight face to have his child placed in his care." But counsel argued that the appropriate permanency option was creating a guardianship with N.W.'s aunt so that Ronald could "continue[] to be a part of his daughter's life."

The juvenile court rejected Ronald's proposal and terminated his parental rights based on Iowa Code sections 232.116(1)(e) and (h) (2024). He appeals.

## II. Analysis

In his appeal, Ronald does not contest the grounds for termination. *See* Iowa Code § 232.116(1)*; In re B.T*., 894 N.W.2d 29, 32 (Iowa Ct App. 2017) (noting that when parent does not dispute those grounds, we need not discuss that step). Instead, he focuses on N.W.'s best interests. So we follow the framework in Iowa Code section 232.116(2), giving primary consideration to the child's safety, to the best placement for furthering her long-term nurturing and growth, and to her physical, mental, and emotional condition and needs.

In arguing best interests, Ronald does not mention N.W.'s safety—a concern given his history of domestic violence and criminality. Rather, he urges that reversing the termination and establishing a guardianship with his sister would allow him "to continue to work on addressing his issues that he has (housing and employment) while ensuring N.W. has the stability that the juvenile court values." He also highlights the benefit to N.W. of being "raised in a family environment."

In its response, the State acknowledges that the paternal aunt voiced a desire to be a placement for N.W. if the child could not be returned to either parent. To that end, the aunt participated in FaceTime visits with N.W. But the aunt has not seen N.W. in person throughout this entire case. The State also noted that without a current ICPC approving the Illinois placement, the juvenile court could not have ordered the department to move N.W. to her aunt's home. *See* Iowa Code § 232.158(3)(d). Given these circumstances, the State advocates against Ronald's guardianship proposal.

In weighing those two positions, we appreciate the father's goal to continue improving himself and to be a part of his daughter's life. And our court has recognized the value of a guardianship when the would-be guardian has been a constant presence in the child's life and will remain so despite termination of parental rights. *See B.T.*, 894 N.W.2d at 34 (noting that ten-year-old child wanted to stay with grandmother if mother could not remain sober).

But N.W.'s situation is unlike B.T.'s case. Here, the aunt has not been a regular caretaker for N.W. or a placement during the CINA case. *See id.* at 31. The aunt is just beginning to develop a relationship with N.W., and at age three, the child is too young to express her preference. *See In re A.S.*, 906 N.W.2d 467, 478 (Iowa 2018). Plus, the GAL recommended termination over the uncertainty of a guardianship. On this record, we agree that a guardianship would not serve N.W.'s best interests. So, we affirm the termination order.

**AFFIRMED.**